We'll hear the first orally argued case, Vugo. May it please the Court, Kathy Park for the City of New York. The challenge restrictions present no First Amendment violation here. Vugo agrees that Central Standard here, and the rules easily pass that test. As a district court correctly found, the City has a substantial interest in shielding passengers from intrusive advertising, an interest that is particularly acute in the context here, where you're talking about captive audiences who don't have any choice or volition in the matter in choosing to have the message thrust upon them. There's also... Can I just be clear about something at the outset, if you could help me with this? Yes, Your Honor. I understand you, do I understand you correctly, at least in a footnote, footnote four on the blue brief, that the rules are a valid time, place, and manner restrictions? Yes, Your Honor, we take the position that to the extent that this could be viewed as a challenge that encompasses not only commercial speech, but also non-commercial speech, that that would be a time, a valid time, place, and manner restriction. But this case has always been litigated as a commercial speech case. Both parties agree on that point. And to that extent, it's Central Hudson's standard that applies. So the question, is this a valid time, place, and manner restriction? Your answer is what? I understand the thrust of the way in which you've argued the case, but as to that question, what's your answer? Yes, it is a valid time, place, and manner restriction. There's a valid interest here in the government regulating this kind of speech. It's narrowly tailored, and it's also, there are alternative open channels of communication available to advertisers. They wouldn't be just limited in this particular context of taxicabs or for hire vehicles. But if that answers Your Honor's question, I'm turning back to what's really the core of this case, which is the rules not only has the city set forth a substantial interest in protecting and promoting passenger comfort, but there's also a reasonable fit between the challenged restrictions and the city's goal of addressing this harm. Can I ask you another informational question, and that is, I understand the required to have taxi TV, is that right? That's right, Your Honor. The rules no longer mandate the passenger information monitor. That would be the monitor that would display taxi TV as of, I believe, June or July 2018. So that is correct, and that's aligned . . . So what's the effect of that? Are yellow cabs not, are the new cabs not having the monitors? Well, Your Honor, it's, the monitor aspect of the feature isn't mandated. It still remains to be seen what . . . My understanding is that there is now technology available that doesn't require a monitor, but still would allow for the other features of the old technology system that would allow for . . . But the idea of the monitor was to offset the cost of putting the new That's right. The question is, are yellow cab fleets or drivers or medallion owners, are they deciding, we don't need that revenue anymore, we'll just put the the equipment in without the taxi TV, without the monitor? Well, the Commission has left it up to the taxi cab drivers and for them to decide whether . . . because after our experience with that exception, there's been numerous complaints about taxi TV. But what's happened is my question. Your Honor, I can, I don't know exactly what has happened, what percentage of taxi cab drivers has not opted to put in this system. That is certainly something that I can find out from the Commission and let you know. They still can put in that system and it would still help them offset the cost of putting it in. That's right, that option is . . . One of the required systems. Right, that option is still available for taxi cab drivers. It's just no longer a mandatory, it's no longer a mandatory requirement to install these monitors with taxi TV. And the reason why the Commission has, has gone this route is because after allowing for the exception to offset costs, there's been numerous complaints, not only from the passengers about the intrusive nature of taxi TV, but also taxi drivers have apparently have been, according to media reports, have been elated to find that this is no longer a mandatory option. So aligned with, you know, whether there is a competing interest and whether this is to further the overall goal of passenger comfort. Why do taxi drivers care? Well, Your Honor . . . People aren't going to like, say I'm not riding in your cab because I see you've got a monitor back there. They're still going to get in the cab. And they get money from having it in the cab. So why does the taxi driver care? Well, Your Honor, I believe there are media reports that say that the taxi cab drivers perceive it as, actually they have been losing business in this system. Because passengers don't want taxi TV. And so they've been opting for other modes of transportation that don't have this requirement. And so that's why it would, it would be relevant here. And that's . . . There are some owners of taxi cabs and some advertisers that want this. Some advertisers who would like to advertise both in taxi cabs and maybe the cars that we're talking about here today. And there are some owners of cars that would like to make some revenue from that. So why doesn't the fact that the city has permitted this to happen with taxi cabs sort of undercut its argument that it's essential that it not happen or it's very important that it not happen with regard to these other vehicles? Well, because the Supreme Court has noted that a municipality is not required to resolve a problem all at once. And certainly there could be other competing interests that the city or government could consider that might outweigh the asserted interest. It's not required to consider its aesthetic interest in a vacuum compared to other interests. And here, where initially when in 2005 the city decided to make this exception, it made a judgment that, that having, allowing taxi TV in the taxi cab context as a trade-off for the other conveniences to passengers it would provide, including credit card payment, protections against fraud, more accurate fares, that that would be justified by those competing interests and promote the overall goal of passenger cars. That's different in the for hire vehicle context where you already have many of these conveniences and you don't need a technology. I thought Judge Livingston was going to be something along the lines of, because this equipment's expensive and we were trying to help out the cab, the medallion owners by saying, well, you can pay for this at an expense that we're requiring by allowing advertising in your cab, which underwrites at least part of the cost of this. I thought that was the principal reason for it. Am I wrong? It is. And the reason why we have that technology in the first place is because there are conveniences that would be given to passengers. That technology keeps track of trip data. It keeps track of fares. It allows for credit card payment. These are features that don't exist in the for hire vehicle context. And so this technology is not mandated in the for hire vehicle context and there's no need to provide for a way to offset those costs in that context. This is very, I would like to just liken this case to the Metro Media case where the Supreme Court said for the municipality to allow for the exception of on-site commercial advertising. That a city could find that its commercial interests in allowing for that exception could outweigh the other municipal interests and aesthetic interests in that particular context. And that it's okay to make that distinction. That's something that the court will accept because there is deference according to the commission in making these kinds of judgments. And so that is why even with this exception, it doesn't undercut the city's overall goal of promoting, of dealing with the problem of intrusive advertising. It's still materially alleviates its harm and certainly there's no suggestion in this case that this exception was simply just meant as a pretext for something where the city is trying to regulate certain messages. These are rules that apply even handedly. The distinction between taxi cabs and for hire vehicles, it's a content neutral distinction. And this case is really just far afield from the kinds of circumstances that were present in the Discovery Network case. Where in that case, the regulation only, there was such a minute benefit derived from the restrictions. That's right, your honor. It was only 4%. But it is true that in the interest of what you could call an entirely separate interest, we want to have this credit card feature in taxi cabs. The interest in offsetting expenses for that ends up creating a situation where a very, very large percentage of rides of this sort in the city, advertisers are advertising. And that's, it may not be 4%, but it's not insubstantial. Right, your honor. But there is, the test requires the city to address the problem to a material degree. And certainly there is, there's a substantial portion of the problem that's going to be addressed by the restrictions. Now, yes, there- Is it something like one third of the- As of the 2016 numbers, one third of ridership was through for hire vehicles. And those numbers are continually, continuing to rise and have recently, recently for hire vehicle ridership has actually overtaken taxi cab ridership. And the municipality, and the city commission is entitled to consider that trajectory in deciding how to address these problems. And I should note again, as of, as of, as of this summer, the taxi tip is no longer even a requirement in taxi cabs too. So the commission is, you know, recognizes it's an intrusive, it's a harm that it wants to address. It created a limited exception in the interest of giving, recognizing it as perhaps an acceptable trade off for some of the other conveniences that, that the technology system would provide but now has decided to, to modify that, that requirement so that it's no longer mandatory in taxi cabs. You'll have two minutes for rebuttal. Thank you, your honor. Good morning, your honors. My name is Ronald Riccio. May it please the court. Before the court today is not a content neutral regulation, nor is it a time, place, and manner regulation. Why isn't it a time, place, and manner regulation? Because the, the prohibition restricts, suppresses commercial speech. When government suppresses commercial speech by its very nature, it's making a judgment about the content or the message that's being conveyed. If the rules apply to non-commercial and commercial ads, and at various points the city seems to suggest that argument, why isn't this a time, place, and manner regulation? Because the rule in this case, based on the record, pertains to advertising. A request was made to install a tablet that would convey an advertising message, and the TLC said you can't do it, it's prohibited. It's permitted in taxis, but it's not permitted in four-hire vehicles. It's never been questioned at the district court level, nor do I think, does it appear in the record anywhere, that we're dealing with something other than a content-based restriction on commercial speech. And for that reason, the TLC's burden, as the court well knows, is a very heavy burden. There's a presumption of invalidity that attaches to what the TLC has done here. One thing I'm not sure of, and please help me understand, is what's the standard? At times it seems that you're pointing to a strict scrutiny standard. At other times you're looking at a central Hudson standard, an intermediate scrutiny. What is the standard? The standard is the central Hudson standard. The question is, what exactly is the central Hudson standard today, based on the recent number of Supreme Court decisions since 1995? What is clear is that commercial speech is not low-level speech. It used to be years ago, but it isn't anymore. So the intermediate scrutiny standard, which is somewhere between rational basis review and strict scrutiny, the intermediate scrutiny standard, over time, as articulated in central Hudson, has gotten bumped up to the brink of strict scrutiny. But the Supreme Court, although several of the justices have said they think that commercial speech restrictions should be subjected to strict scrutiny, they haven't held that yet. So we are saying to the court that the central Hudson standard should apply in the same way as the court applied it in the Koronia cases, that this court applied it in the Koronia cases and other cases. And what has happened here is the TLC has failed to satisfy the relevant central Hudson standards. Could you take me to the second prong of central Hudson? I mean, your argument, as I understand it, is that it doesn't survive, the ban doesn't survive because it was designed to suppress speech that some people don't like. That's correct. But at this stage of the analysis, aren't we supposed to look at whether the city's asserted interest, the asserted interest is substantial, and the interest that it asserts is the aesthetics of ads, the noise and sights of advertising. And we give the city and the administration of its responsibilities wide berth. I agree with that, that there is deference to the city's asserted statement of what is a substantial interest. They've asserted their substantial interest as being aesthetics. I suggest to the court that this is a suppression of commercial speech masquerading as aesthetics. Because when you get to the heart of it, and you look to the primary reason why the TLC has imposed this restriction, it's because the TLC has determined, not the passengers, but the TLC has determined, that they think that this type of speech is uniquely annoying. Commercial speech, according to the TLC, is uniquely annoying. And government is then saying, we are going to decide what information the passengers in the vehicles can and cannot receive. And that's anathema to the First Amendment. What about the surveys? Do they matter? Well, the surveys go both ways. There are surveys that suggest that people riding in taxis and in for hire vehicles actually enjoy receiving commercial messages. I'd like to meet those people. I'd like to see the survey. Where is the survey that says that? I think there's a Quinnipiac survey that we cited in our brief which talks about that. But the point here is that there's a simple way to decide this case, and I think the district court got it right in this regard, is that the TLC has an obligation to show that its restriction against commercial speech is narrowly drawn. That it's no more extensive than necessary to achieve its purported substantial interest. Even if we can see, for sake of argument, that the TLC has a substantial interest, it's not furthered by a narrowly drawn prohibition against commercial speech.  It's not narrowly drawn because there are less restrictive ways for the TLC to accomplish its governmental purpose other than by suppressing commercial speech. What are those ways? Well, one is the installation of an on, off, mute, or volume control button. That, to me, Your Honors, is the simple... But your client didn't want an on-off button. We're receptive to that. And the record shows that. We would, in fact, if the court, and I think this is on page 404 of the appendix, there is a TLC regulation that specifies what taxi TVs need to have built into it. One of which is an on, off, or mute button, or volume control button. We would have no objection to that because that would then leave the decision as to whether or not the message should be received in the hands of the passenger, not in the hands of government. I thought you said that you wouldn't want to have an on-off button or a mute button, but you'd have a volume button, which would take it down to a very low level. Isn't that what you said in your brief? I don't think so, Your Honor. I know that they say in the city's brief that you refuse to have an off button or a mute button. It's the first page of their brief. But I thought I had seen somewhere that you had said, well, that may be true, but we're going to give you a volume control that can take it down to zero. That's not my understanding of the record, and if it is, Your Honor, I don't think that's an accurate statement of Fugo's position. If the TLC were to mandate for four hire vehicles what it mandates for taxis, which is an on, off, mute, volume control button, as well as placement and manner specification requirements, we would certainly adhere to that, so long as it's not censoring the message. That's the point, and that's the problem with the TLC's blunt instrument here, where it is across the board blocking out all commercial messages in some vehicles, namely the four hire vehicles, but not in taxis, and it makes no sense. It undercuts. Why doesn't it, though, thinking about it, stepping back and thinking about it from the city's point of view as an administration issue, what the city is saying is that on the one hand, it wants to make the ride experience a more pleasant experience from its perspective. You may disagree as to what constitutes pleasant or not. So it has this ban, but at the same time, it's got some competing interests, essentially, in terms of ensuring that there are these devices that make it easier to monitor what's going on in cabs, and so it permits, essentially, this exception to the ban. Why isn't your adversary correct that just as an administrative matter, you can't achieve everything at once, and that it makes sense from a rational point of view to have a policy that essentially phases in the result that you want to achieve? Because along the way, you cannot suppress the speech. That's the point. We're dealing with probably the highest-ranking individual liberty that we have in this country, the freedom of speech, and if the TLC has reasons for wanting to proceed incrementally toward a particular goal, whatever that goal might be, whether it be aesthetics or whether it be shielding passengers from an annoying ad, they can't do it along the way by suppressing speech. They can do it by a content-neutral specification requirement. They can do it by saying if you want to carry ads on a tablet in your car, you need to put a volume control button, an on-off mute button, but what you can't do is you can't say, we think we'd like to protect passengers from annoying speech. So, therefore, what we're going to do is we, the government, are going to tell the passengers that we know what's best for you. You don't know what's best for yourself. How about the whole range of billboard cases? I'm sure you're more familiar with them than I am, but we have these set of cases where we make judgments about some parts of town. The aesthetics are going to be very much impaired. We don't really want the billboards in the city parks. They're fine in other parts of town. The regulatory body makes judgments, and the regulatory scheme as a whole is still materially advancing the interest in having a physical environment in the city that's good for everybody. Your Honor, and the billboard cases are all over the lot. I've noticed. As many of the free speech cases, although not the commercial speech cases, by the way, because the Supreme Court has been consistent in bumping up the tier of review, and I'll get to the billboard point in a moment, but they're consistent in bumping up the tier of review and consistently striking down government regulations that prohibit commercial speech. In the billboard setting, it's complicated by the fact that sometimes you're dealing with a public forum. You're sometimes dealing with the ability to avert your eyes. You're sometimes dealing with private property. So it's difficult to lump the billboard cases into one sort of framework and say this is the way it is. Not so with the commercial speech cases. With the commercial speech cases, the criteria are fairly well established, and what we know here is we know that the TLC has reasonable alternatives that are less speech restrictive, that are not speech restrictive at all, that can accomplish their governmental purpose, and we also know that their approach to this problem is radically under-inclusive. It's under-inclusive both in terms of degree and in terms of rationale, and this is what the ---- So you're saying, setting aside the, I get the, there's a less restrictive alternative with the on-off switch, but on prong three, you're saying they're not, they just can't take into account, they can't balance their interest in having this credit card machine and offsetting the payment and the owners. That's an invalid balancing. Yes, because there's no direct and material nexus between the means used and the ends sought to be achieved. It's radically under-inclusive because hundreds of thousands of passengers are being exposed to what the TLC thinks are annoying ads as a result of the TLC's policy. That doesn't further the governmental interest. The under-inclusiveness in terms of degree and rationale, namely save the taxi owners' and taxi drivers' money, has nothing to do with the governmental purpose, and for that reason ---- The ban is still effective, isn't it? One-third of the passengers don't have to hear these ads. But not effective in a, it may be effective in a vacuum, but it's not effective in a direct and material way toward achieving the government interest, which it has to be under Central Hudson, and which it's not. Thank you, Your Honors. So you view direct relationship as a stand-alone requirement? Each of the Central Hudson factors is a stand-alone requirement. Two, three, and four. If the city doesn't meet its burden on two or three or four, it fails. Thank you. Your Honor, I just want to touch quickly on the idea of whether there are actually alternatives, feasible alternatives for the city to have entertained here. I mean, the reasonably tailored prong, the last prong of the Central Hudson test, requires a city consideration of whether there are numerous or an obvious, obviously less burden alternative. Certainly there aren't, no one has identified any numerous options. The only one that has been identified is an on-off button. And it's not obvious that that is less burdensome. Isn't there something to it? I mean, we have TV sets in our homes. I don't think that they make the home an inhospitable environment because you can turn the TV set off. Well, I have several responses to that. First, the city's experience with taxi TV has shown that there is a problem with malfunctioning switches and buttons, problems with monitoring compliance, something that would be exponentially more burdensome in the for hire context because, A, there are a lot more for hire vehicles than taxi cabs. B, you're talking about different systems as compared to the uniform system that's in place with taxi TV. C, the fact that you're not talking about fixed monitors, but a tablet that a driver could easily remove and easily avert compliance. And I know that I just want to note that although my adversary points to rules in the commission that call for inspections of for hire vehicles, that rule actually just applies. The three times a year requirement just applies to regular DMV inspections. The TLC inspects these vehicles actually every two years when there's a license, a new license or a license renewal. And for the commission to now set up a scheme where we're inspecting these vehicles for compliance with these technological configurations more frequently, at least it's not obvious that that would be a less burdensome option. And that's why the city has met its burden on this prong. Just by way of helping me understand the market a little bit more, some of these for hire vehicles are companies, right? Some of them are Uber, but some are I run a limo, I run a black car company. Yes, Your Honor. And those companies would make a decision whether they think advertising is increasing their revenue or not. I mean, if it was too disruptive to passengers, wouldn't they decide, gosh, this is too annoying, or am I missing something? I mean, meaning that the company would not contract with an advertiser to install a device if it thought it was driving away business. Yes, conceivably, that would happen if we did permit advertising in these vehicles. But I also just want to note, again, back on the administrative scheme, the problems with just regulating the content of these materials that the commission would be put in the position of if we allowed for these restrictions and the problems that would arise from that. But back to Your Honor's question. Yes, conceivably, they could make that decision. But the business model is premised on trying to get as many vehicles to embark on video advertising. And we don't know, I mean, my understanding is actually the commission has received inquiries from other similar Vugo-type companies. And we're not even just talking about Vugo, one competitor. And so to the extent that Your Honor's question is touching on whether, you know, how many of these four-hire vehicles will actually allow for video advertising, I think that it was still reasonable for the city to decide that because the business model is premised on trying to get as many of these vehicles to sign on as possible, the record includes letters of intent from various libraries or drivers who say that they would sign on with Vugo if it was permitted. It was reasonable for the commission to set this restriction to address this harm. And because the restrictions easily pass the requirements of Central Hudson, we ask this court to reverse the district court's judgment. Thank you, Your Honors. Thank you both for your arguments. The court will reserve decision.